# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| **STATE OF INDIANA ex rel.** | ) | |
| **Gregory F. Zoeller, Attorney General of** | ) | |
| **Indiana and the CITY OF EAST CHICAGO** | ) | |
| **ex rel. Gregory F. Zoeller, Attorney General** | ) | |
| **of Indiana,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:04 CV 506** |
| | ) | |
| **ROBERT A. PASTRICK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION and ORDER

## I.    BACKGROUND

On August 3, 2004, the two plaintiffs in this action, the City of East Chicago ("the City") and the State of Indiana ("the State"), filed a complaint alleging that between 1996 and 2004, defendants Robert A. Pastrick, James Harold Fife, III, Frank Kollintzas, and others[1] unlawfully engaged in the management and operation of the City as a racketeering enterprise through a pattern of racketeering activity in violation of federal and Indiana state law; committed theft and official misconduct under Indiana state law; and were unjustly enriched as a result of their actions. (Compl., DE # 1 at 44-50.)

Defendants Pastrick and Fife answered the complaint and participated in pre-trial proceedings, but shortly before the trial date advised the court that they would no

---

[1]     Plaintiffs' complaint initially named more than two dozen individual and corporate defendants. By the time this case reached the final phases of litigation, only three defendants remained: Pastrick, Fife, and Kollintzas. For purposes of this order, the court uses "defendants" to refer to Pastrick, Fife, and Kollintzas only, unless otherwise indicated.

longer defend against the allegations and would, instead, accept judgment by default. (*See* DE ## 543, 544, 546.) Just as they had informed the court, Pastrick and Fife did not appear on May 26, 2009, the date the trial was set to begin. (DE # 550.) Kollintzas, who filed no answer to the complaint, also failed to appear at the time set for trial. (*Id.*)

Following defendants' failure to appear at trial, plaintiffs obtained an entry of default from the Clerk of the Court. (DE ## 551, 555.) Plaintiffs then moved the court for default judgment on liability against defendants. (DE # 548.) The court held a hearing on the issue of defendants' default on liability on June 1, 2009; plaintiffs provided proper notice of the hearing to defendants. (DE # 556.) The court found defendants liable by default on June 2, 2009, and granted defendant Pastrick's motion to dismiss his counterclaim. (DE ## 558, 559, 560, 561.)

The court held an evidentiary hearing on the issue of damages on June 9, 2009. (DE # 565.) Plaintiffs appeared through Special Deputy Attorneys General Patrick M. Collins, Joel R. Levin, G. Robert Blakey, and Deputy Attorney General David A. Arthur. (*Id.*) Defendant Pastrick appeared by counsel, Michael Bosch; defendant Fife appeared *pro se*; and defendant Kollintzas did not appear. (*Id.*) At the hearing, plaintiffs presented witnesses, each of which the court found credible, introduced exhibits relating to their requests for damages and other relief, and made arguments relating to the facts and the law. (*Id.*) Defendants cross-examined certain of plaintiffs' witnesses, but presented no evidence in their defense. (*Id.*) At the conclusion of the hearing, the court took the case under advisement. (*Id.*)

The court has considered all the filings, testimony, evidence of record, and arguments of the parties,[2] and now makes the following findings of fact and conclusions of law. In so doing, the court incorporates by reference all findings contained in the court's findings of liability by default with regard to Pastrick, Fife, and Kollintzas. (DE ## 559, 560, & 561.)

## II.     FINDINGS OF FACT [3]

Because defendants have accepted default on matters of liability, the well-pleaded allegations in the complaint are taken as true. *Black v. Lane,* 22 F.3d 1395, 1399 (7th Cir. 1994). Additional facts related to damages were proven at the damages hearing held on June 9, 2009; citations to relevant portions of the hearing transcript ("Tr.") and the exhibits presented at that hearing ("Hr. Ex.") appear below.

### The Pastrick Political Machine

Defendant Pastrick was elected to serve as the City's mayor in 1971 and was re-elected every term through 2003. (Compl. ¶ 10.) Defendant Kollintzas was elected in 1979 to serve as a member of the City's Common Council as Fourth District Councilman, and was re-elected every term through 2003. (*Id.* ¶ 13.) Defendant Fife was Pastrick's confidant and served as his Special Assistant. (*Id.* ¶ 20.) Timothy Raykovich,

---

[2]     To the extent that plaintiffs have moved after the conclusion of the hearing on damages to supplement the record with additional evidence, the request is denied. (*See* DE # 570, Pls.' Prop. Find. of Fact & Concl. of Law 2 n.1 (seeking leave to supplement the record with an excerpt of Pastrick's deposition testimony).)

[3]     Any finding of fact deemed to be a conclusion of law is hereby incorporated as such, and any conclusion of law deemed to be a finding of fact is hereby incorporated as such.

another defendant in this case who settled with plaintiffs before trial, was an associate of Pastrick who served as one of his primary aides. (Tr. 42.)

As Pastrick and his associates managed and operated the City, they drew little distinction between government affairs, political affairs, and personal affairs. Job applications for governmental jobs included a signature line for the applicant's political sponsor. (Tr. 20; Hr. Ex. 19.) Newly hired employees were presented with an opportunity to contribute a percentage of their salary, withdrawn from their paychecks, to a "flower fund" or "slush fund." (Tr. 21, 85-86.) While contributions were supposed to be voluntary, it was understood that there were ramifications for not participating. (*Id.* at 85-86.) The slush fund was used for political purposes, such as financing campaigns and purchasing signs. (*Id.* at 22.) The City Controller, Edwardo Maldonado, who also served as the treasurer of what he called the political "machine," ran reports for Pastrick's office that identified which employees were contributing to the mayor's political fund. (*Id.* at 15-16, 22.) Pastrick and his associates also maintained as much as $25,000-$30,000 in a safe in the Controller's office. (*Id.* at 47.) Prior to elections, the Controller would give Pastrick and Fife somewhere between $2,000-$5,000 in cash from the safe, which the Controller understood was used to pay poll workers. (*Id.* at 47-48.) There was no accounting of the cash that was maintained in the safe. (*Id.* at 48.)

During his mayoral administration, Pastrick and his associates caused the City payroll to increase markedly in the period leading up to elections when as many as 50-90 new employees were hired. (*Id.* at 23.) Pastrick and his associates encouraged employees to vote for Pastrick. (Hr. Ex. 33.) Contractors or consultants who were

political allies received preferential treatment in the award of City contracts. (Tr. 23-24.) Most City department heads also held leadership roles in the Pastrick political organization. (*Id.* at 24.) In the 2003 City election, Pastrick and the other defendants engaged in a coordinated effort to buy the votes of absentee voters by giving or promising them money. (Compl. ¶ 131; Tr. 65.)

Fife served as the head of Pastrick's political organization and was one of the highest paid consultants for the City. (Tr. 24.) Fife drafted his own contract, with no approval process, to be a consultant for the City Board of Public Works. (Tr. 38-39; Hr. Ex. 24.) Fife also served as a liaison between the casino riverboats and the City. (Tr. 40; Hr. Ex. 26.)

## The "Sidewalks for Votes" Scheme

In approximately June of 1998, the City's Board of Public Works initiated a "Street Improvement Program" in order to replace concrete public sidewalks in some portions of the City. (Compl. ¶ 63.) While specifications were developed for the Street Improvement Program and contractor Rieth-Riley, one of the settling defendants, submitted a bid to perform some of the work, the bid was not accepted and the Board of Public Works took no action on the proposed program. (*Id.* ¶¶ 63-66.)

In early 1999, the Board of Public Works again authorized public bids for a sidewalk improvement program, but again the Board took no action on the bids submitted. (*Id.* ¶¶ 68-73; Tr. 27.) Notwithstanding the Board's failure to approve the sidewalk program, defendants induced contractors to perform millions of dollars of

work on sidewalks and parking lots on public and private property beginning in February of 1999 and continuing until May 1999. (Compl. ¶ 74.)

Defendants arranged for this concrete work, as well as tree trimming work, in order to curry political favor with residents and thereby advance the political prospects of Pastrick and his slate of candidates, who were facing tough opposition in the May 1999 primary. (*Id.* ¶¶ 48, 74.) The sidewalk/tree program served as the centerpiece for Pastrick's 1999 primary campaign. (Hr. Exs. 21, 33.) To circumvent Indiana bidding laws, defendants had contractors submit invoices and bids in amounts less than $75,000 even when the proposed work was in excess of that amount. (Compl. ¶¶ 75-76; Tr. 69.)

Kollintzas and other City Council members approached City residents and businesses and falsely represented that the City had a duly authorized and lawful program to pay for the work being done on either public or private property and offered contractors opportunities to perform the work as a means of inducing political support. (Compl. ¶ 78.) On one occasion, Pastrick authorized work at a religious institution, Our Lady of Guadalupe Church. (Compl. ¶ 78; Tr. 30-32.)

Shortly before the May 1999 election, Maldonado, serving as City Controller, expressed concern to Fife that the City would start bouncing checks because of the uncontrolled spending for the sidewalk and tree project. (Tr. 34.) Fife asked whether there were sufficient funds to make it through the election and Maldonado replied that there were. (*Id.* at 34.) Fife then told Maldonado that they would worry about it after the election. (*Id.*) Shortly after the May 1999 election, National City Bank refused to honor numerous City checks. (Compl. ¶ 87.) Raykovich and Fife directed contractors to stop all work. In some instances, contractors walked away from job sites, leaving work

unfinished; in others, workers left behind dangerous and hazardous conditions for City residents from the unfinished sidewalk, driveways, patios, and porches. (*Id.*)

In mid-1999, Pastrick and his associates embarked on an effort to conceal and cover up the illegal sidewalk and tree program by creating false and misleading documents, including backdated contracts. (*Id.* ¶¶ 96-99.) The City, under Pastrick's control, paid contractors that had supported the Pastrick political machine millions of additional dollars as part of the cover-up. (*Id.* ¶¶ 107-110; Hr. Tr. 35-36.)

In total, defendants caused the City to pay $23,993,005.53 to contractors as part of the sidewalk and tree trimming scheme. (Hr. Ex. 1; Tr. 155-56, 166-67.) Payments were made to the contractors via check and wire transfer. (Compl. ¶ 81.) The checks or their electronic representations proceeded through a financial institution's clearinghouse in Chicago, Illinois, or the Federal Reserve Bank of Chicago, and then back across state lines to National City Bank in East Chicago, Indiana. (*Id.* ¶ 81.) As a result of the City's spending, members of the Pastrick racketeering enterprise entirely depleted the City's general fund by May 1999, at which time the City's general fund bank account was overdrawn by several million dollars. (*Id.* ¶ 85.)

### The Bond Issuance Program

Once the City's general fund was exhausted and its bank account overdrawn, defendants and other members of the racketeering enterprise embarked on a "second stage" to finance the sidewalk scheme. (*Id.* ¶ 88.) First, the City tapped into casino

revenue[4] that was being held in a trust fund to pay millions of dollars in bills from the sidewalk and tree program. (*Id.* ¶ 88.) Thereafter, members of the Pastrick enterprise arranged for corrupt bond authorizations and appropriations by the Common Council by concealing the fact that public money previously spent on the sidewalk scheme had neither been paid pursuant to properly accepted public bids, nor appropriated by the Common Council. (*Id.* ¶ 89.)

The City Council called a special meeting on June 15, 1999, and passed an ordinance appropriating $14 million, which included $13.5 million for contractual services and a $450,000.00 disbursement for "capital outlay." (*Id.* ¶ 90.) Members of the racketeering enterprise orchestrated the approval of an ordinance authorizing the City to issue municipal bonds not to exceed $15 million and to issue bond anticipation notes not to exceed $15 million to pay the cost of certain capital improvements in the City. (*Id.*) Bond anticipation notes were issued in July of 1999 and generated proceeds of $13.75 million that were used to pay contractors for as yet uncompensated work related to the sidewalk scheme and to replenish City bank accounts that had been depleted as a result of the money paid to sidewalk and tree contractors. (*Id.* ¶ 101.)

The City paid $1,221,270.24 in interest on the bonds, $171,875.00 in underwriter fees, and $75,690.74 in legal fees related to the bond issuance program. (Tr. 156-58; Hr. Ex. 1.) The City also paid $75,000.00 to Fife and $75,000.00 to Raykovich's company Cybersystems, Inc., for services rendered in relation to the bond anticipation notes. (Tr.

---

[4] The financial arrangement between the City and a riverboat casino in the area is discussed in further detail later in this opinion.

156-58; Hr. Ex. 1.) In total, defendants caused the City to expend $1,618,835.98 on the bond issuance program.

## The Showboat Casino Agreement

After the legislative and voter approval for the East Chicago Showboat Casino ("the Casino") occurred in 1993-94, the City entered into an agreement with the Casino whereby economic development payments totaling 3% of the Casino's adjusted gross receipts were to be paid in the following amounts: 1% to the City of East Chicago; 1% to the Twin City Education Foundation; and 1% to the East Chicago Community Foundation. (Compl. ¶ 52; Hr. Ex. 28.) The two foundations have since been consolidated into one non-profit foundation called the Foundations of East Chicago, Inc. ("the Foundations"). (Tr. 127; *see also* Foundations' Mot. to Intervene, DE # 573 at 1.) The City and the Casino also agreed that the Casino would divert an additional 0.75% of the Casino's adjusted gross receipts to Second Century, Inc., a for-profit corporation. (Tr. 57; Hr. Ex. 28.)

Pastrick, without the approval of the City's Common Council, and having no executive authority to divert the City's money and property, created a "trust fund" for the receipt of the 1% fee that the Casino paid to the City. (Compl. ¶ 58.) Pastrick exercised sole power and control over the expenditure of funds in the trust fund. (*Id.* ¶ 60.) In contrast to the system employed by Pastrick, in Hammond, Indiana, all casino fees were paid directly to the City of Hammond to be appropriated by the City Council and then disbursed. (Tr. 122.) The payments from the Casino to the City, either in the form of a check or the electronic representation thereof, proceeded through the Chicago

Clearing House Association or the Federal Reserve Bank of Chicago, and then back across state lines to the payor bank in East Chicago. (Compl. ¶ 61.)

## The Aftermath

When Pastrick left office, the City's general fund had a deficit of $17 million. (Tr. 125, 147.) The projected budget shortfall was approximately $5.5 million. (*Id.* at 147.) The City payroll had grown to over 1,045 employees, far in excess of the comparably sized Michigan City. (Tr. 147; Hr. Exs. 5, 6.) Because of Pastrick's and defendants' long-term pattern of fraud and political corruption, the City is presently in a state of disrepair. (Tr. 149.) The City's streets and sewers are in desperate need of repair or replacement, and abandoned buildings are prevalent on the landscape but cannot be demolished due to lack of funding. (*Id.*)

The succeeding City administration has taken steps to address the financial disaster left behind by Pastrick's unlawful operation and management of the City as a racketeering enterprise. (*Id.* at 124-25, 147-48.) The 1% of Casino revenue that was directed to the City has been transferred into the general wagering and admission account so that it can be appropriated in the same manner as any other funds. (*Id.* at 125.) Expenditures have been reduced and some City workers have been laid off to address the bloated payroll. (*Id.* at 147-48.)

Several associates of Pastrick, including Maldonado and Kollintzas, were indicted and convicted for their participation in the "Sidewalk for Votes" scheme. (Hr. Exs. 11, 12, 15 at 7.) The City paid $1,662,801.00 for legal representation for the

defendants who were convicted of defrauding the City. (Hr. Exs. 1, 15 at 7; Tr. 63, 157-58.)

Pastrick received $914,755.46 in wages from the City between 1996 and 2005, and $6,000.00 in non-employee compensation from the City between 1996 and 1998. (Tr. 162; Hr. Ex. 3.) Fife received $20,353.80 in wages from the City in 1996 and $819,763.04 in non-employee compensation between 1996 and 2003. (Tr. 160-61; Hr. Ex. 2.) Raykovich received $1,502,735.00 in non-employee compensation between 1996 and 2005. (Hr. Ex. 4.) Fife's consulting firms received $757,509.00 from the City and "related entities"[5] between 1998 and 2001. (Tr. 160-61; Ex. 2.) Raykovich's consulting firms, Cybersystems, Inc., and Cenifax Network Solutions, Inc., received $643,873.00 and $247,612.00, respectively, between 1998 and 2004. (Tr. 42-43; Hr. Ex. 4, 15.)

## III.    CONCLUSIONS OF LAW [6]

### A.    *Summary of Claims*

### Counts 1 & 2: Federal RICO Violations

In their complaint, plaintiffs alleged that defendants committed racketeering offenses (Count 1) and participated in conspiracies to commit racketeering offenses (Count 2) in violation of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"). (Compl. ¶¶ 139-56.) Title 18, section 1962(c) of the United States Code provides that it is "unlawful for any person employed by or associated with any

---

[5]    The significance of plaintiffs' assertion that Fife's firms were paid not by the City but by "related entities" is discussed later in this opinion.

[6]    Note 3, *supra*, is incorporated by reference.

enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Title 18, section 1962(d), also makes it unlawful for any person to conspire to violate RICO.

To establish a claim under section 1962(c), a plaintiff must establish: (1) defendants were persons employed by or associated with an enterprise that was engaged in or affected interstate commerce; (2) who conducted or participated in the conduct of the enterprises' affairs; (3) through a pattern of racketeering activity; and (4) plaintiffs suffered a loss as a result of the racketeering activity. 18 U.S.C. §§ 1962(c) & 1964(c); *see also Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 386-87 (7th Cir. 1984). The term "racketeering activity" is defined by a long list of "predicate acts," which includes transferring converted funds in violation of 18 U.S.C. § 2314. More specifically, section 2314 prohibits "transport[ing], transmit[ting], or transfer[ing] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud."

Section 1964 provides a civil remedy for those injured by a RICO violation:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964(c).

## Count 3: Indiana "Little RICO" Violations

Plaintiffs also asserted in their complaint that defendants violated Indiana's "little RICO" statute (Compl. ¶¶ 157-67), which states:

> A person:
>
> (1) who has knowingly or intentionally received any proceeds directly or indirectly derived from a pattern of racketeering activity, and who uses or invests those proceeds or the proceeds derived from them to acquire an interest in property or to establish or to operate an enterprise; or
>
> (2) who through a pattern of racketeering activity, knowingly or intentionally acquires or maintains, either directly or indirectly, an interest in or control of property or an enterprise; or
>
> (3) who is employed by or associated with an enterprise, and who knowingly or intentionally conducts or otherwise participates in the activities of that enterprise through a pattern of racketeering activity;
>
> commits corrupt business influence, a Class C felony.

IND. CODE § 35-45-6-2. Participating in a "pattern of racketeering activity" is defined as "engaging in at least two (2) incidents of racketeering activity that have the same or similar intent, result, accomplice, victim, or method of commission, or that are otherwise interrelated by distinguishing characteristics that are not isolated incidents." *Id.* § 35-45-6-1(d). To engage in "[r]acketeering activity" is "to commit, to attempt to commit, to conspire to commit a violation of, or aiding and abetting in a violation" of one of a number of enumerated laws. *Id.* § 35-45-6-1(e). Two of these enumerated laws prohibit theft, *id.* § 35-45-6-1(14), and official misconduct, *id.* § 35-45-6-1(19).

A person commits theft under Indiana law when he or she "knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use." *Id.* § 35-43-4-2. A public

servant commits official misconduct when he "knowingly or intentionally performs an act that the public servant is forbidden by law to perform," "performs an act the public servant is not authorized by law to perform, with intent to obtain any property for himself or herself," or "knowingly or intentionally acquires or divests himself or herself of a pecuniary interest in any property, transaction, or enterprise or aids another person to do so based on information obtained by virtue of the public servant's office that official action that has not been made public is contemplated." *Id.* § 35-44-1-2(1), (2), & (4). A person also commits official misconduct by knowingly or intentionally violating section 36-6-4-17(b), which states that a township executive (who is elected by the voters of the township, *id.* § 36-6-4-2) "may not make any other personal use of township funds without prior approval by the legislative body of the township." *Id.* § 35-44-1-2(6).

The Indiana Code states that "[a]n aggrieved person may bring an action against a person who has violated IC 35-45-6-2 . . . for damages suffered as a result of corrupt business influence." *Id.* § 34-24-2-6(b). The aggrieved person is entitled to "an amount equal to three (3) times the person's actual damages; (2) the costs of the action; (3) a reasonable attorney's fee; and (4) any punitive damages awarded by the court and allowable under the law." *Id.* Further, "[a]n aggrieved person may . . . bring an action for injunctive relief," and upon finding "through a preponderance of the evidence, that the aggrieved person is suffering from corrupt business influence" the court may enter "an appropriate order for injunctive relief." *Id.* § 34-24-2-6.

The Indiana racketeering statute was modeled on the federal RICO statute, and the Seventh Circuit has applied essentially the same analysis to both types of actions.

*Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 476 (7th Cir. 2007) (dismissing Indiana little RICO claim due to failure of federal RICO claim, which Indiana's statute was modeled after). For this reason, the court's analysis as to one statute is applicable as to the other within this opinion unless otherwise specified.

## Count 5: Indiana Civil Recovery for Crime Victims Act Violation

Finally, plaintiffs asserted a claim based on Indiana's Civil Recovery for Crime Victims Act (the "Crime Victims Act"), alleging that defendants committed the crime of theft and are therefore civilly liable under the statute. The Crime Victims Act allows victims of certain crimes, such as theft, to recover in a civil action the pecuniary loss suffered as a result of the crime. IND. CODE § 34-24-3-1. Notably, "a criminal conviction is not a condition precedent to recovery. The claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant." *White v. Ind. Realty Assocs. II*, 555 N.E.2d 454, 456 (Ind. 1990) (internal citation omitted).

As this court has already stated, theft is committed when a person "knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use." *Id.* § 35-43-4-2. The remedy for a violation of section 34-24-3-1 is "[a]n amount not to exceed three (3) times the actual damages of the person suffering the loss," costs, reasonable attorneys' fees, and compensation for travel and loss of time for filing the action. *Id.* § 34-24-3-1(1)-(7).

## Summary of Defendants' Default on Liability

As the court stated in its orders finding defendants in default on liability (DE ## 559-60), defendants' actions as alleged in the complaint, admitted by defendants by

virtue of their default, and summarized in the court's findings of fact herein establish

defendants' liability on the aforementioned claims. As defendants have admitted, by

operating the Pastrick political machine to benefit themselves both personally and

politically and by orchestrating the "Sidewalks for Votes" scheme and the subsequent

bond issuance program, defendants:

- Violated RICO by engaging in: (1) the repeated and continuous instances of the transfer or transmittal in interstate commerce of money known to have been stolen, converted, or taken by fraud; and (2) a conspiracy to do the same; and

- Violated Indiana's little RICO statute through repeated and continuous instances of theft and official misconduct constituting racketeering activity. In connection with this pattern of racketeering activity, defendants: knowingly and intentionally received proceeds derived from the pattern of racketeering activity, and used those proceeds (and the proceeds derived from them) to establish and operate their enterprise; knowingly and intentionally acquired and maintained an interest in or control in the enterprise; and were employed by or associated with the enterprise while knowingly and intentionally participating in the enterprise's pattern of racketeering activity; and

- Committed theft, and therefore are civilly liable under the Crime Victims Act, by knowingly and intentionally exerting unauthorized control over

property and money belonging to the City, with the intent to deprive the

City of any part of the value or use of that property and money.[7]

## B. Damages

Plaintiffs concede that the court should not award any damages that would be

duplicative of other relief granted. (Pls.' Prop. Find. of Fact & Concl. of Law 22.) This

court is in agreement. "'[T]he law abhors duplicative recoveries.'" *Collins v. Kibort*, 143

F.3d 331, 339-40 (7th Cir. 1998) (quoting *Dopp v. HTP Corp.*, 947 F.2d 506, 517 (1st Cir.

1991), alterations in *Collins*); *see also Volk v. Coler*, 845 F.2d 1422, 1436 (7th Cir. 1988)

(holding that plaintiff may not receive two recoveries for the same alleged wrongs).

---

[7]     Plaintiffs' complaint also included a common law unjust enrichment claim.
(Compl. ¶¶ 168-72.) Under Indiana law, equitable principles such as unjust enrichment
will not apply where there exists a remedy at law. *King v. Terry*, 805 N.E.2d 397, 400
(Ind. Ct. App. 2004). Plaintiffs appear to have elected the legal remedies available under
RICO, Indiana's little RICO statute, and the Crime Victims Act in lieu of any equitable
remedy under a theory of unjust enrichment. (*See generally* DE # 570, Pls.' Prop. Find. of
Fact & Concl. of Law (proposing findings and conclusions as to all counts except unjust
enrichment); DE ## 548 & 552, Mots. for Def. J. (seeking default judgment on all counts
except unjust enrichment).) Accordingly, the court need not address the claim here.
     In any event,  a number of district courts have held that RICO provides an
adequate remedy at law such that an unjust enrichment claim is unavailable. *E.g.*,
*Ducote Jax Holdings, L.L.C. v. Bradley*, No. 04-1943, 2007 WL 2008505, at *11 (E.D. La. July
5, 2007) ("However, because the Plaintiffs have adequate remedies at law available in
the form of their RICO, breach of fiduciary [sic], negligent misrepresentation, fraud and
civil conspiracy claims, the Plaintiffs are not entitled to damages for unjust
enrichment."); *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 (D.
Mass. 2003) (dismissing unjust enrichment claim because plaintiffs had adequate
remedy in RICO); *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002)
("[T]he lack of an adequate remedy [needed to support an unjust enrichment claim] is
not self-evident. The RICO claims entitle successful Plaintiffs to treble damages.").
Accordingly, even if the court did consider the merits of plaintiffs' unjust enrichment
claim, it would hold that plaintiffs' adequate legal remedy in RICO, Indiana's little
RICO statute, and the Crime Victims Act precludes plaintiff from recovering in equity
via an unjust enrichment claim.

The damages plaintiffs seek pursuant to RICO, Indiana's little RICO statute, and the Crime Victims Act would compensate for the same losses stemming from the same pattern of wrongful conduct. Accordingly, the court will order defendants to pay only the greatest of the amounts of damages recoverable under any one of the three statutes; the two lesser amounts would, in this case, simply be duplicative. *Bogan v. City of Boston,* 489 F.3d 417, 425-26 (1st Cir. 2007); *Mason v. Okla. Tpk. Auth.,* 115 F.3d 1442, 1459 (10th Cir. 1997) ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery. . . . [T]he court, either sua sponte or on motion of a party, should reduce the judgment by the amount of the duplication."); *Telecom Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.,* No. Civ. A. 1:95-CV-649WB, 2000 WL 35568637, at *5 (N.D. Ga. July 26, 2000) ("Where two recoveries are duplicative, the court will elect the damage award affording the injured party the greater recovery."); *DSC Commc'n Corp. v. DGI Techs., Inc.,* No. 394-CV-1047-X, 1997 WL 34592521, at *1 (N.D. Tex. Nov. 17, 1997) ("DSC has prevailed on several claims. The Court awards the greatest amount of damages . . . on claims based on the same facts and aspects of damages so that in fairness no double recovery is had by DSC due to different theories of recovery."). Below the court considers, in turn, the various types of damages sought by plaintiffs, analyzing the availability of each type under each of plaintiffs' causes of action.

## Proximately Caused Damages

As summarized above, the federal RICO statute, the Indiana little RICO statute, and the Crime Victims Act each allow a court to award treble damages for injuries

*caused by* a defendant's wrongdoing. 18 U.S.C. § 1964(c) (allowing treble damages for anyone "injured in his business or property *by reason of* a violation of section 1962") (emphasis added); IND. CODE § 34-24-2-6(b) (allowing three times the "damages suffered *as a result of* corrupt business influence") (emphasis added); IND. CODE § 34-24-3-1 (allowing damages for any person who "suffers a pecuniary loss *as a result of* a violation") (emphasis added). These three statutes simply require that the damages awarded be proximately caused by a defendant's wrongdoing. *Hemi Group, LLC, v. City of New York,* 130 S. Ct. 983, 988 (2010) (requiring proximate cause for RICO violation); *Keesling v. Beegle,* 858 N.E.2d 980, 992 (Ind. Ct. App. 2006) (requiring proximate cause for Indiana little RICO violation), *overruled in part on other grounds,* 880 N.E.2d 1202 (2008); *Obremski v. Henderson,* 497 N.E.2d 909, 910-11 (Ind. 1986) (requiring proximate cause for Crime Victims Act violation, then codified at IND. CODE § 34-4-30-1).

The United States Supreme Court recently held that proximate cause, for purposes of RICO, requires "'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi,* 130 S. Ct. at 988 (quoting *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 271, 274 (1992), alteration in *Hemi,* citation in *Hemi* omitted). The Seventh Circuit applied the same proximate cause standard to an Indiana little RICO claim in *Raybestos Products Co. v. Younger,* 54 F.3d 1234, 1243 (7th Cir. 1995). The Indiana Court of Appeals later agreed with *Raybestos* that a showing of proximate cause was required for an Indiana little RICO claim and reiterated a prior Indiana Supreme Court ruling which defined proximate cause as "'that cause which, in natural and continuous sequence,

unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" *Keesling,* 858 N.E.2d at 992 (quoting *Peters v. Forster,* 804 N.E.2d 736, 743 (Ind. 2004)). With these similar standards for proximate cause in mind, the court finds that in this case the following types of damages were proximately caused by defendants' violations of the statutes named above.

First, as defendants admitted by virtue of their default on liability, defendants' racketeering enterprise caused the City's funds to be expended for the Pastrick political machine's own purposes in the form of the Sidewalks for Votes scheme. Defendants arranged for unauthorized contractors to receive compensation for their participation in the scheme, knowing that the contractors did not perform legitimate public work to earn such compensation. Plaintiffs proved at the hearing on damages that the total amount paid to contractors involved in the Sidewalks for Votes scheme was $23,993,005.53. (Hr. Ex. 1; Tr. 155-56, 166-67.)

Further, plaintiffs proved that defendants' racketeering scheme caused the City to become financially unstable and the City was required to issue bonds to raise funds and pay $1,618,835.98 for underwriting, legal fees, consulting services, and interest in relation to the bonds. (Hr. Ex. 1; Tr. 61-62, 156-57.) The City's losses for the Sidewalks for Votes scheme and the subsequent bond issuance program are recoverable because they were proximately caused by defendants wrongful conduct. *See Brown v. Cassens Transp. Co.,* 546 F.3d 347, 357 (6th Cir. 2008) (fraudulent scheme deprived plaintiffs of worker's compensation benefits, causing plaintiffs to incur losses in the form of

expenses for medical care and attorneys' fees); *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467, 472 (8th Cir. 1985) (where defendants invested wrongfully obtained money for their own benefit rather than using the money to improve subdivision roads, expenditures necessary to maintain roads in subdivision were recoverable as damages under RICO); *Corporacion Insular de Seguros v. Reyes-Munoz,* 849 F. Supp. 126, 133-34 (D.P.R. 1994) (holding that plaintiffs were harmed by loss of the value of eleven checks that were fraudulently issued as a result of the defendants' illegal scheme).

Second, plaintiffs proved that defendants' racketeering scheme caused the City to pay $1,662,801.00 to defend corrupt members of its staff against criminal charges.[8] These expenses are recoverable as damages proximately caused by defendants' wrongful conduct. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1105 (2d Cir. 1988) (allowing recovery under RICO for legal fees and expenses incurred in fighting and overcoming bribe-induced decisions in separate lawsuits); *Alexander Grant & Co. v. Tiffany Indus., Inc.,* 770 F.2d 717, 719 (8th Cir. 1985) (expenses incurred by RICO plaintiff in responding to SEC subpoenas and requests for documents, interviews, the giving of testimony, and counsel fees in connection with RICO defendant's separate SEC investigation were actionable RICO injuries); *Curiale v. Capolino,* 883 F. Supp. 941, 951 (S.D.N.Y. 1995) (awarding and trebling under RICO costs incurred by municipal

---

[8]    Attorneys' fees and costs related to the *present* cause of action are specifically enumerated in each of the relevant statutes as recoverable. 18 U.S.C. § 1964(c) (allowing for recovery of "the cost of the suit, including a reasonable attorney's fee" under RICO); IND. CODE § 34-24-2-6(b) (allowing "a reasonable attorney's fee" under Indiana's little RICO statute); IND. CODE § 34-24-3-1(3) (allowing "[a] reasonable attorney's fee" under Crime Victims Act). These expenses are addressed at the conclusion of this opinion.

superintendent of insurance in defending breach of contract lawsuit brought by corrupt businessman who had illegally procured the contracts with the department of insurance).

In total, defendants' wrongful conduct, as summarized so far, proximately caused the City to be injured in the amount of $27,274,642.51.

### Defendants' Compensation

Plaintiffs seek to recover and treble the salaries and other compensation defendants received while they abused their positions in public office. (Pls.' Prop. Find. of Fact & Concl. of Law 5, 20.) Plaintiffs' argument that they are entitled to recover this compensation focuses on RICO jurisprudence and rests almost exclusively upon *United States v. Horak*, 833 F.2d 1235, 1242-43 (7th Cir. 1987), in which the court held that the forfeiture of a defendant's job, salary, bonuses, and corporate profit-sharing plans was permissible under section 1962, the *criminal* RICO statute. However, the criminal RICO statute is inapplicable to this civil suit, as is the caselaw interpreting it.

Further, the remedy Congress selected for civil RICO suits is not the same as the remedy it chose for criminal RICO cases. Contrary to the criminal RICO statute, which provides mechanisms for forfeiture, the civil RICO statute states that *damages* may be recovered by "[a]ny person injured in his business or property *by reason of a violation* of section 1962." 18 U.S.C. § 1964(c) (emphasis added). The court can only presume that the differences Congress created between the civil and criminal RICO remedies were intentional. As the Supreme Court stated in interpreting RICO, "[w]here Congress includes particular language in one section of a statute but omits it in another section of

the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983) (internal quotation marks omitted).

Because Congress made the amount of plaintiffs' loss–not the amount of defendants' gain–the remedy under the civil RICO statute, the court's inquiry is whether a municipality's loss in the form of compensation paid to misperforming government officials is a "harm occasioned as a result of" defendants' misconduct. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1310 (7th Cir. 1987). The Courts of Appeals have not addressed this question. However, as explained below, the court is persuaded by the opinions of several district courts that have held that salaries or compensation are not recoverable under the civil RICO statute.

In *State of West Virginia v. Moore,* the State of West Virginia sued its former governor under section 1964 and sought, as part of its damages, the salary it paid to the governor during his term. 895 F. Supp. 864 (S.D. W. Va. 1995). A West Virginia district court, in denying the request, explained that "the [RICO] statute looks at the financial position of the plaintiff. Common law equitable doctrines, on the other hand, often focus on the defendant, forcing him to give up ill-gotten gains." *Id.* at 870. The court held that even "[a]ssuming Moore became Governor solely as a result of his alleged fraud, the State still suffered no damages-it would have paid a Governor's salary even if Moore had not committed fraud and another candidate had taken the office." *Id.*

A district court in New Jersey came to the same conclusion in *Township of Marlboro v. Scannapieco,* 545 F. Supp. 2d 452, 460-61 (D.N.J. 2008). The *Marlboro* court

held that payments of salaries "were not proximately caused by any alleged bribery scheme. Indeed, Marlboro would have made such payments even if these Defendants did not engage in the alleged bribery scheme. In other words, the alleged violations of section 1962 did not cause, either directly or indirectly, Marlboro to compensate its employees." *Id.* at 461; *see also Claire's Stores, Inc. v. Abrams,* No. 86 C 9851, 1989 WL 134959, at *5-6 (N.D. Ill. Oct. 16, 1989) ("[P]laintiff's injury, payment of compensation to defendants under the mistaken belief defendants were faithful fiduciaries, may have been proximately caused by a breach of fiduciary duty but not by a RICO violation.").

On the other hand, several courts in the Southern District of New York have allowed civil RICO plaintiffs to recover the salaries of corrupt public officials as damages.[9] *City of New York v. JAM Consultants, Inc.,* 889 F. Supp. 103, 105 (S.D.N.Y. 1995) ("Salary payments to [a city] employee who either fails to perform his duties or performs them corruptly may be recovered from the employee under RICO."); *City of New York v. Bower,* No. 89 Civ. 4179, 1991 WL 19810, at *2 (S.D.N.Y. Feb. 1, 1991) ("a disloyal employee, whose salary was not apportioned in his contract and whose disloyalty tainted his activities, must forfeit his entire salary for his period of disloyalty"). However, in these cases, the court fashioned the RICO remedy by

---

[9]     This trend appears isolated to the Southern District of New York. At first glance it might appear that one Northern District of Illinois court condoned measuring the remedy in a civil RICO action in accordance with state law principles, analogizing RICO to tortious interference with a contract. *Cook County v. Lynch,* 620 F. Supp. 1256, 1257-59 (N.D. Ill. 1985). However, the *Lynch* court appears to have simply assumed without actually deciding the issue because "Lynch d[id] not object" to the County's position that its damages under RICO should be measured in that way. *Id.* at 1257-58.

employing a New York common law agency principle under which "an employee who is disloyal to the interests of his employer forfeits his right to compensation for services rendered by him." *JAM Consultants,* 889 F. Supp. at 105.

Plaintiffs have not asked the court to superimpose a common law measure of damages onto RICO, Indiana's little RICO statute, or the Crime Victims Act, and even if they did, the court would find that to do so would be unnecessary because the statutory texts clearly delineate what damages that are available. 18 U.S.C. § 1964(c) (allowing treble damages for anyone "injured in his business or property *by reason of a violation* of section 1962") (emphasis added); IND. CODE § 34-24-2-6(b) (allowing award of three times the "damages suffered *as a result of* corrupt business influence") (emphasis added); IND. CODE § 34-24-3-1 (allowing damages for any person who "suffers a pecuniary loss *as a result of* a violation") (emphasis added). The holdings of cases like *Moore* and *Marlboro* are more faithful to the texts of RICO and the other statutes at issue in this case, which clearly require proximate causation as a prerequisite for recovery.

Like the township in *Marlboro* and the state in *Moore,* the City did not compensate its officials and employees as a result of defendants' illegal scheme. Further, the City has not presented any evidence that it would not have compensated *someone*—either defendants or some other individuals occupying their positions—without the existence of defendants' illegal scheme. *Moore*, 895 F. Supp. at 870. In other words, defendants wrongdoing "did not cause, either directly or indirectly, [the City] to compensate its employees." *Marlboro,* 545 F. Supp. 2d at 461. Because RICO, Indiana's little RICO statute, and the Crime Victims Act provide

essentially the same proximate cause requirement for the recovery of damages, the court's reason for rejecting plaintiffs' RICO-focused argument applies equally with respect to each statute.

**Payments to Consulting Firms**

There are also causation problems with plaintiffs' request for damages in the amount of the money paid to consulting firms affiliated with Raykovich and Fife. Plaintiffs contend that Raykovich's firms, Cybersystems, Inc., and Cenifax Network Solutions, Inc., were paid $643,873.00 and $247,612.00, respectively, between 1998 and 2004. (Hr. Ex. 4.) At the hearing on damages it was established that these figures came from the Indiana State Board of Accounts Auditing Report, which was also submitted as evidence at the hearing. (Tr. 163.) That report states that "Timothy Raykovich, Special Assistant to the Mayor, has a separate financial interest connected with two firms doing business with the City of East Chicago; Cyber Systems, Inc., and Cenifax Networks Solutions, Inc. Since 1998, Cyber Systems, Inc., and Cenifax Network Solutions, Inc., have been paid $643,873 and $247,612, respectively, by the City of East Chicago." (Hr. Ex. 15 at 8.)

First, it is unclear if the $643,873.00 paid to CyberSystems includes the $75,000.00 plaintiffs claim was paid to CyberSystems for services rendered in relation to the bond anticipation notes. (*See* section II, *supra*, at 7-9.) If it does, then the same $75,000.00 should not be counted twice in the computation of damages. But in any event, unlike plaintiffs' evidence regarding the $75,000.00 paid to CyberSystems as part of the bond issuance program, plaintiffs' evidence regarding the $643,873.00 paid to Cybersystems

fails to establish a causal link between defendants' illegal scheme and the City's loss. Plaintiffs have not proven why the City paid an additional $643,873.00 to CyberSystems or explained how that payment was made as a result of defendants' illegal activities. All that is known is that payments were made because the firms were "doing business with the City." (Hr. Ex. 15 at 8.) Plaintiffs essentially ask the court to assume that any money Raykovich received was tainted by defendants' wrongful conduct, which the court cannot do. Though Raykovich may have received $643,873.00, the court's concern for purposes of determining damages is not what Raykovich gained, but what the City lost as a result of defendants' improper activities. Without a causal connection between defendants' scheme and the City's loss, the court is unable to allow the City to recover the payments to Raykovich's firms.

The same is true regarding plaintiffs' request for damages in the amount the City paid to consulting firms related to Fife. Plaintiffs submit that an undisclosed number of unnamed consulting firms which bear some connection to Fife were paid $757,509.00 by the City "and related entities" between 1998 and 2001. (Tr. 160-61; Hr. Ex. 2.) However, it remains largely unexplained why the money was paid to Fife's firms and it is not clear how the expenditures resulted from the illegal scheme. Thus, plaintiffs' request for damages in the amount paid to firms associated with Fife fails for the same reason as the request related to firms associated with Raykovich.

In addition to a lack of proof regarding a causal connection between defendants' scheme and plaintiffs' loss, there are two other problems with plaintiffs' request for the $757,509.00 paid to Fife-related firms. First, payments made by "related entities" to

Fife's consulting firms may not be recovered in this action if these "related entities" are not plaintiffs in this lawsuit. Remedies are available to "a person injured" under RICO, 18 U.S.C. § 1964; "[a]n aggrieved person" under Indiana's little RICO statute, IND. CODE § 34-24-2-6(b); and "a person" who "suffers a pecuniary loss" under the Crime Victims Act, IND. CODE § 34-24-3-1. Thus, if a payment was made by a non-party to Fife or his consulting firm, neither the City nor the State was the entity injured in making that payment. Plaintiffs' failure to explain which losses were sustained by which entities makes granting plaintiffs' request virtually impossible.

Second, plaintiffs have offered inadequate proof in support of this request. Plaintiffs' only support on this issue is the sentencing transcript from Fife's criminal proceedings which reveals that the court adopted the government's sentencing memorandum during Fife's sentencing. (Tr. 160-61; Hr. Ex. 2.) Part of that memorandum stated that Fife used four sham consulting firms to disguise his receipt of $757,509.00 in fees that he received from the City and failed to report as income. However, the court's findings of fact at Fife's criminal sentencing proceeding are not sufficient to establish the same facts for purposes of this civil action for damages. *See Kosinski v. C.I.R.,* 541 F.3d 671, 675-79 (6th Cir. 2008) (sentencing fact findings did not have preclusive effect in civil action); *Maciel v. C.I.R.,* 489 F.3d 1018, 1023 (9th Cir. 2007) (same); *Unites States v. U.S. Currency in Amount of $119,984.00, More or Less,* 304 F.3d 165, 172-73 (2d Cir. 2002) (same); *S.E.C. v. Monarch Funding Corp.,* 192 F.3d 295, 305-06 (2d Cir. 1999) (same); *United States v. Real Prop. Located at 7401-03 S. Racine Ave., Chi., Ill.,* No. 04 CV 5885, 2009 WL 806120, at *2-3 (N.D. Ill. Mar. 25, 2009) (noting lack of Seventh

Circuit ruling on issue and opting to follow Second and Ninth Circuit guidance to find

no preclusive effect of fact findings from criminal sentencing proceedings in civil

action).[10] For this and the other above-stated reasons, plaintiffs may not recover the

amounts allegedly paid to Fife-related firms.

## Prejudgment Interest

Plaintiffs seek prejudgment interest on the damages awarded under each of their

claims, for deprivation of the use of those funds over the period of time in which

defendants defrauded the people of East Chicago and operated their illegal scheme of

political corruption. The Seventh Circuit has stated that the purpose of prejudgment

interest is the same under either Indiana or federal law: to fully compensate the injured,

but not to penalize the party causing injury. *Raybestos,* 54 F.3d at 1246. When a case

arises under federal question jurisdiction but also contains supplemental state law

claims, as this case does, the issue of prejudgment interest on the state law claims is

governed by state law, and the federal claims by federal law. *Freeman v. Package Mach.*

*Co.,* 865 F.2d 1331, 1345 (1st Cir. 1988); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 692 (2d

Cir. 1983); *Stulberg v. Intermedics Orthopedics, Inc.,* No. 94 C 4805, 1999 WL 759608, at *10

---

[10]    As *Kosinski* aptly explains, the procedural rules for criminal sentencing proceedings are significantly different than those for a civil action. Significantly, in a criminal sentencing proceeding, a defendant is not entitled to civil discovery privileges and many of the protections of the rules of evidence do not apply. *Kosinski,* 541 F.3d at 677. Constitutional matters are in play during criminal sentencing proceedings that are not applicable in civil suits. *Id.* at 678. Further, a party's incentive to litigate an issue may be different in a criminal sentencing proceeding than it would be in a civil suit; a defendant may not contest an issue during sentencing because the resolution of the issue would not change the guideline range, but the stakes may be far higher in a civil suit involving the same issue. *Id.* at 678-79.

(N.D. Ill. Aug. 31, 1999); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, No. 92 C 2379, 1994 WL 86179, at *3 (N.D. Ill. Mar. 15, 1994). For the reasons that follow, prejudgment interest is allowed on the state claims but not on the federal claims.

*State Law Claims*

As to plaintiffs' state law claims, "Indiana law generally permits the assessment of prejudgment interest as an element of damages where the damages are fixed and ascertainable at a definite time prior to rendering judgment." *Midland-Guardian Co. v. United Consumers Club, Inc.*, 499 N.E.2d 792, 800 (Ind. Ct. App. 1986). This case involves only fixed and ascertainable damages, not damages that would, for example, require the court to exercise its judgment regarding value. *Cf. Mueller v. Karns*, 873 N.E.2d 652, 600 (Ind. Ct. App. 2007) (no prejudgment interest for quantum meruit claim where amount of damages did not rest on simple calculation and required exercise of judgment on value of services). Accordingly, prejudgment interest is appropriate.[11]

Plaintiffs state that interest should run from August 3, 2004, the date they filed their complaint, through the date of this judgment. (*See* Pls.' Prop. Find. of Fact & Concl. of Law 23.) However, under the Indiana statute governing prejudgment interest in this case (which plaintiffs cite, *id.* at 22), the period during which prejudgment interest accrues begins at the latest of either 15 months after the cause of action accrued or six months after the claim was filed in court. IND. CODE § 34-51-4-8 (provisions relevant to

---

[11]    The fact that defendants must pay treble damages under Indiana's little RICO statute or the Crime Victims Act does not change the court's outcome. While it is improper to award prejudgment interest on punitive damages or a fixed statutory penalty, statutory treble damages are not punitive, nor are they a fixed statutory penalty. *Midland*, 499 N.E.2d at 800 (analyzing treble damages provision of UCC).

medical malpractice claims omitted). Nonetheless, this court need not decide the precise date from which interest should accrue. The time period in which prejudgment interest may be applied cannot exceed 48 months. *Id.* § 34-51-4-8. In this case, whether the court selected the first day of accrual in accordance with plaintiffs' suggestion or the statute, the date would be more than 48 months prior to this judgment.

Thus, defendants are responsible for a total of 48 months worth of prejudgment interest on the state law claims, the maximum that is allowed by statute, despite the fact that the City was deprived of the use of those funds for much longer. The court is permitted to choose a simple (*i.e.,* non-compounding) interest rate between 6 and 10 percent. *Id.* § 34-51-4-9. The court selects 8 percent, which is the same rate plaintiffs have requested. *See DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.,* No. 3:99-CV-0569RM, 2002 WL 33831760, at *3 (N.D. Ind. Dec. 9, 2002) (choosing 8 percent). The amount of interest in this case is $8,727,885.60. In accordance with *Midland,* the court appends this interest to the $27,274,642.51 in damages recoverable under either state statute *before* trebling the sum. 499 N.E.2d at 800 (holding that lower court did not err in awarding prejudgment interest and trebling the interest along with the other damages). Thus, the City's total recovery under either Indiana's little RICO statute or the Crime Victims Act is $36,002,528.11 times three, or $108,007,584.33.

*Federal Claims*

Plaintiffs also seek prejudgment interest on damages awarded for violations of the federal RICO statute. Though the Seventh Circuit has not spoken directly on the propriety of prejudgment interest for RICO awards, it has not allowed plaintiffs in other

cases involving federal statutes to obtain prejudgment interest in addition to doubled or

trebled damages, reasoning that to do so would overcompensate the plaintiff. *See, e.g.,*

*Fishman v. Estate of Wirtz*, 807 F.2d 520, 561 (7th Cir. 1986) (no prejudgment interest

allowed on treble damages in federal antitrust case); *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d

399, 406 (7th Cir. 1999) (no prejudgment interest allowed on doubled damages under

FLSA); *Fortino v. Quasar Co.*, 950 F.2d 389, 397 (7th Cir. 1991) ("if double damages are

awarded [under the ADEA] prejudgment interest may not be awarded"); *EEOC v.*

*O'Grady*, 857 F.2d 383, 392 n.13 (7th Cir. 1988). ("A district court in this circuit may not

award both prejudgment interest and liquidated [doubled] damages in an ADEA

action."). Because the Seventh Circuit has historically disallowed prejudgment interest

where a plaintiff received doubled or trebled damages, the court denies plaintiffs'

request for prejudgment interest on the City's treble damages award under RICO.[12]

---

[12]     The First and Second Circuits have held that prejudgment interest in addition to
treble damages under RICO may be awarded at the trial court's discretion. *Aetna Cas.
Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1571-72 (1st Cir. 1994); *Abou-Khadra v. Mahshie*, 4
F.3d 1071, 1083-84 (2d Cir. 1993) ("Since the RICO statute does not contain any
provisions concerning the award of prejudgment interest, the district court had
discretion as to whether to award such interest."). However, the vast majority of courts
exercising their discretion in this regard have concluded that prejudgment interest in
addition to treble damages under RICO was inappropriate because the trebled damages
were adequate to compensate the plaintiff for the damages it sustained and to award
additional prejudgment interest would result in overcompensation. *See, e.g., Abou-
Khadra*, 4 F.3d at 1083-84; *Panix Prods., Ltd. v. Lewis*, No. 01 Civ. 2709 HB, 2003 WL
21659370, at *3 (S.D.N.Y. July 15, 2003); *In re Crazy Eddie Secs. Litig.*, 948 F. Supp. 1154,
1167 (E.D.N.Y. 1996); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 642 F. Supp.
781, 811 (E.D. La. 1986).
        Accordingly, even if it were permissible at the court's discretion to award
prejudgment interest for the federal RICO claim in this case, this court would find that
the recovery of treble damages is sufficient to compensate plaintiffs for the
unavailability of funds during the time period in question.

<h1 style="text-align:center">Summary of Damages Allowed</h1>

In this case, the City has proven[13] that it has sustained RICO damages, under either section 1962(c) or (d), in the amount of $27,274,642.51; after trebling, the City's RICO award rises to $81,823,927.53. As to the state law claims, prejudgment interest in the amount of $8,727,885.60 is allowed on the $27,274,642.51 recoverable under the City's state law claims; the sum of these two amounts, $36,002,528.11, is then trebled and becomes $108,007,584.33.[14] Thus, the greatest recovery for the wrongs committed in this case–$108,007,584.33–is available under either the Indiana little RICO claim or the Indiana Crime Victims Act claim. This amount subsumes the $81,823,927.53 recoverable under the federal RICO statute. Further, as explained previously, $108,007,584.33 may be recovered only once even though both state statutes allow for this measure of damages.

Defendants' liability to the City for the damages described herein is joint and several. *See Fleischhauer v. Feltner,* 879 F.2d 1290, 1301 (6th Cir. 1989) (joint and several liability appropriate for civil RICO violation); *United States v. Philip Morris USA,* 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (stating that "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants

---

[13]     Because the proof offered at the hearing on damages established that only the City experienced losses and not the State, as a technical matter the court awards these damages to the City alone.

[14]     Though plaintiffs stated that they sought "punitive" damages in their complaint, they appear to have abandoned this remedy. (*See* Pl.'s Proposed Findings of Fact and Conclusions of Law 23-25 (proposing recovery of only trebled actual damages and prejudgment interest).)

participate in the enterprise responsible for the RICO violations" and summarizing

cases); *Nance v. Miami Sand & Gravel, LLC,* 825 N.E.2d 826, 835 (Ind. Ct. App. 2005)

(holding that under Indiana law, joint and several liability is imposed where acts of

tortfeasors through cooperation or in concert accomplish a particular wrong or if

independent acts combine to produce a single injury); *Burgett v. Haynes,* 572 N.E.2d

1296, 1298 (Ind. Ct. App. 1991) (joint and several liability appropriate for violations of

Crime Victims Act, then codified at IND. CODE § 34-4-30-1).[15]

### C.    *Injunctive Relief*

**Injunction Prohibiting Defendants from Holding Office**

Plaintiffs seek an injunction forever prohibiting defendants from holding

positions of public office in the United States. (Pls.' Prop. Find. of Fact & Concl. of Law

25.) It is unclear whether injunctive relief is available under the federal civil RICO

---

[15]    Before the undersigned was assigned to preside over this case, Judge Allen Sharp found that six corporate defendants—contractors in the Sidewalks for Votes scheme—had defaulted and were liable to plaintiffs in various amounts of damages. (DE # 409, finding A&A Enterprises liable by default for $3,072,830.31; DE # 410, finding Ace Enterprises liable by default for $4,245,681.99; DE # 411, finding B&S Construction Co. liable by default for $621,635.64; DE # 412, finding D/S Commercial Equipment & Construction liable by default for $325,813.59; DE # 413, H & Y Maintenance Co., Inc. liable by default for $7,003,527.00; DE # 415, finding Windstorm Enterprises Inc. liable by default for $2,786,608.68.)

Each of these measures of damages are a component of the $108,007,584.33 that plaintiffs have now proven that defendants Pastrick, Fife, and Kollintzas are jointly and severally liable for by virtue of their involvement in the Sidewalks for Votes scheme. Thus, while Pastrick, Fife, and Kollintzas are jointly and severally liable for the entire $108,007,584.33 for the reasons explained above, each of the six defaulting defendants are also jointly and severally liable with Pastrick, Fife, and Kollintzas for smaller chunks of that $108,007,584.33. The court's final judgment, at the conclusion of this opinion, reflects these "subsets" of liability.

statute when the plaintiff is not the United States Attorney General due to the structure of RICO's text, which suggests that private (that is, non-United States Attorney General) plaintiffs are entitled to only damages as a remedy for a RICO violation. *See Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084-89 (9th Cir. 1986) (holding that non-United States Attorney General plaintiffs may not obtain injunctive relief under RICO); *Trane Co. v. O'Connor Secs.*, 718 F.2d 26, 28-29 (2d Cir. 1983) (expressing "serious doubt" about the propriety of injunctive relief for non-United States Attorney General plaintiffs under RICO); *Dan River, Inc. v. Icahn*, 701 F.2d 278, 290 (4th Cir. 1983) (expressing "substantial doubt whether RICO grants private parties such as Dan River a cause of action for equitable relief").[16] By contrast, the Indiana little RICO statute allows injunctive relief for any "aggrieved person," IND. CODE § 34-24-2-6(a), but even assuming injunctive relief were available to plaintiffs under either statute, the court finds plaintiffs have not proven their entitlement to an injunction in this case.

Plaintiffs first brought their intentions to seek this sweepingly broad injunctive relief to the court's attention in their Proposed Findings of Fact and Conclusions of Law on June 22, 2009, despite the fact that they had already specifically sought leave to file and subsequently filed a detailed "Memorandum on Damages and Injunctive Relief" (DE # 562) and were given a full opportunity to litigate any issues related to damages

---

[16] The Seventh Circuit at one point held that injunctive relief *was* available to private party plaintiffs under RICO. *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 698 (7th Cir. 2001). However, the Supreme Court, after granting certiorari on this very question, opted to reverse the Seventh Circuit's opinion without addressing the issue squarely. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003).

before the undersigned on June 9, 2009. Plaintiffs have not attempted to even articulate, much less prove, their entitlement to this injunction. The Seventh Circuit held that a plaintiff's success by default and the failure of the defendant to interpose objections to plaintiff's requests for relief did not automatically entitle the plaintiff to a permanent injunction. *e360 Insight v. The Spamhaus Project,* 500 F.3d 594, 604 (7th Cir. 2007). The same is true in this case. Plaintiffs do not explain what standard the court should apply in determining whether to issue this injunction, whether that standard should come from federal or state law, what elements it requires plaintiffs to establish, or how plaintiffs have satisfied those elements in this case. Nor do plaintiffs attempt to justify the scope of their proposed injunction. Finally, plaintiffs do not address potential First Amendment problems, if any, that this injunction might implicate. For these reasons, plaintiffs' request is denied.

### Forensic Audit of the Foundations

Plaintiffs also request that this court order a forensic audit of the Foundations and Second Century, two third parties that were not named as defendants in this litigation.[17] As the court has already explained stated, the Foundations previously consisted of two separate entities, Twin Cities Education Foundation and East Chicago Community Foundation. (Tr. 127; *see also* Foundations' Mot. to Intervene, DE # 573 at 1.)

---

[17] As discussed previously (*see* section III, C, *supra*, at 35-36) it is unclear whether injunctive relief is available to non-United States Attorney General plaintiffs under RICO, but the court assumes for purposes of this opinion that plaintiffs could seek injunctive relief under Indiana's little RICO statute, which allows any "aggrieved person" to seek an injunction upon a showing by a preponderance of the evidence that such person has suffered from corrupt business practices. IND. CODE § 34-24-2-6(a).

Pursuant to the 1994 agreement between the City and the Casino, the Foundations received 2% (1% for each of the then-separate foundations) of the Casino's adjusted gross receipts, while Second Century received 0.75% of the same. (Compl. ¶ 52; Hr. Ex. 28 at 050073.) The Foundations issued grants, which the City had been fairly successful in obtaining until recently. (Tr. 151.) The details of Second Century's operations are largely unknown. (*Id.* at 59, 128.) Plaintiffs seek, purportedly in accordance with RICO, a "forensic accounting" of the Foundations and Second Century regarding the expenditures made with the funds received pursuant to the agreement, as well as the disgorgement of any funds from these third parties that are determined (through a process plaintiffs do not explain) to have been improperly used. (*Id.* at 176-80.) Plaintiffs stated at the hearing on damages that "[i]f they made legitimate grants, we have no complaint. But if the money went to Pastrick family, kids, then that money ought to come back to the City." (*Id.* at 176.)

The history of plaintiffs' request for an investigation into the files of and the disgorgement of funds from these two third parties is quite short. Plaintiffs did not indicate any interest in looking into the financial records of third parties in their complaint. Nor was any mention made on the date set for trial or the hearing on defendants' defaults on liability. In plaintiffs' memorandum on damages, which was filed on June 2, 2009, one week before the damages hearing, plaintiffs introduced for the first time the idea of an "audit to be undertaken under the supervision of the State Board of Accounts" to "assess . . . the amounts and purposes of casino funds." (DE # 562 at 16.) After the court orally denied the request for an audit for lack of legal

support at the hearing on damages, plaintiffs rephrased their request as one for a "forensic accounting," stating that "by our misuse of words, we made you think we were only talking about the kind of audit the State Board of Accounts would do." (Tr. 177.) The Foundations have since moved to intervene for the limited purpose of contesting any relief sought against them. (DE # 573.)

*Due Process*

The obvious and most critical problem with plaintiffs' request is that it cannot be reconciled with principles of due process. Plaintiffs' request offends two interrelated facets of due process. First, the court does not have jurisdiction over the Foundations and Second Century, who were not named in the complaint and served with process, *United States ex rel. Lee v. Illinois,* 343 F.2d 120, 120-21 (7th Cir. 1965), and as a result, they would not be bound by a judgment in this litigation. *Hansberry v. Lee,* 311 U.S. 32, 40 (1940). Second, because the Foundations and Second Century were not named as parties, they have been deprived of an opportunity to be heard throughout this litigation on the matters leading up to plaintiffs' request for relief against them, which is "antithetical to the primary axiom of our jurisprudence that no man shall be subject to judicial sanction without the opportunity for a hearing on the merits of the claim." *Herrlein v. Kanakis,* 526 F.2d 252, 255 (7th Cir. 1975).[18] These core, intertwined due

---

[18]    The fact that the Foundations have moved to intervene (DE # 573) does not now mean that the Foundations have had a right to be heard as to their potential liability in this case. The Foundations moved explicitly "for the limited purpose of objecting to any relief sought against the Foundations." (*Id.* at 1.) It is clear from the Foundations' motion to intervene that the Foundations want to play no part in this case, and plaintiffs have made no attempt to join them as parties to litigate the issue of the Foundations' liability.

process issues prevent the court from ordering the remedy plaintiffs seek in this case. Nonetheless, the court addresses plaintiffs' arguments regarding their request for a forensic audit of the Foundations and Second Century below.

*Plaintiffs' Arguments*

Despite the conspicuous due process and jurisdictional concerns that plaintiffs' request raises, plaintiffs have presented little authority in support of their argument that this court should order a forensic accounting of two non-parties. When plaintiffs finally requested their newly-rephrased relief from the court at the conclusion of the hearing on damages, plaintiffs' counsel orally cited to one Supreme Court case that simply has no bearing on the propriety of orders regarding third parties: *Schine Chain Theatres v. United States,* 334 U.S. 110 (1948).[19] (Tr. 179.) Plaintiffs finally acknowledged the issue squarely in their response to the Foundations' motion to intervene, almost a month after the court held its hearing on damages. (Pls.' Resp. to Mot. to Intervene, DE # 578.) However, as explained below, plaintiffs still have provided no convincing arguments or authority to persuade this court that their request is a proper one.

Plaintiffs' argument that the court may order a forensic accounting of the Foundations and Second Century centers on their claim that, in doing so, the court would not be ordering "relief *against*" third parties, only relief that merely "*impacts*"

---

[19]     As plaintiffs point out, *Schine* is an antitrust case in which the Supreme Court held that antitrust remedies should put an end to the unlawful combination and deprive the antitrust defendants of the gains of their wrongful conduct. 334 U.S. at 126, 128. However, the relief in *Schine* was ordered against a named defendant in the case. Plaintiffs' attempted analogy to *Schine* breaks down at this point, because plaintiffs seek relief against non-parties.

them. (Pls.' Resp. to Mot. to Intervene 17 (emphasis in plaintiffs' filing).) In support of

this argument plaintiffs point to *United States v. Regan,* 858 F.2d 115, 119-20 (2d Cir.

1988), where the Second Circuit upheld a lower court's order of relief directed at a third

party. Plaintiffs also contend that the broad remedial purposes of RICO warrant

granting plaintiffs' request. (Pls.' Resp. to Mot. to Intervene 17 n.2.)

The court is hesitant to concede that a court-ordered forensic accounting of a

non-party's financial records would merely *impact* or *burden*, but not constitute relief

*against,* the non-party. But even if the court allowed itself to indulge in semantics, the

District of Columbia Court of Appeals recently held that a district court exceeded its

authority under RICO by ordering a remedy that only had an "impact" on third parties.

*United States v. Philip Morris USA Inc.,* 566 F.3d 1095, 1141 (D.C. Cir. 2009). In that case,

the district court had ordered the defendant tobacco companies to, in turn, require

third-party retailers to exhibit certain types of displays in a particular manner; if any

retailers did not comply, the defendant tobacco companies were required to suspend

those retailers from their merchandising programs. *Id.* The *Philip Morris* court held that

the district court "exceeded its authority" because the third-party "[r]etailers affected by

this order – none of whom were involved in the litigation in any way – did not receive

notice of this remedy or an opportunity to present evidence or arguments to the district

court regarding the impact the injunction would have on their businesses." *Id.* The court

reasoned that the order created a "potentially serious detriment to innocent persons not

parties to or otherwise heard in the district court proceedings." *Id.*

Having no Seventh Circuit precedent directly on point, the court finds *Philip Morris* highly persuasive. If the district court's order in *Philip Morris*, which only required named parties to demand that third parties adjust their advertising displays, was improper, then plaintiffs' proposed forensic accounting of the financial records of and the possible reclamation of funds from third parties is certainly improper.

Plaintiffs' reliance on *Regan,* 858 F.2d at 119-20, in support of their argument is also misplaced. In *Regan,* the Second Circuit held that under section 1963, the criminal RICO statute, a court was permitted to issue a restraining order against a non-party "to preserve property for forfeiture after a RICO conviction." *Id.* at 120. Of concern to the *Regan* court was the fact that an unnamed third party corporation was in possession of potentially forfeitable property. *Id.* at 117. The *Regan* court conceded that under longstanding precedent, a court generally may not issue an order against a non-party. *Id.* Nonetheless, the court justified allowing an order against a non-party in that case by holding that section 1963(d) restraining orders "differ from the typical injunction designed to affect the conduct of a party based on a determination of that party's legal rights," where "the party is normally restrained from acting in a way determined to be illegal in the course of litigation or ordered to take steps to remedy acts determined to be illegal, again in the course of litigation." *Id.* By contrast, the *Regan* court reasoned, section 1963(d) restraining orders "resemble remedies such as garnishment or attachment that may be directed routinely at third parties." *Id.* The *Regan* court limited its holding to the particular circumstances of that case, holding that third parties could

be subject to a restraining order under section 1963(d) "to preserve property for forfeiture after a RICO conviction." *Id.* at 120.

*Regan* does not apply here for numerous reasons. The injunction in *Regan* was issued pursuant to section 1963 of RICO, which is entitled "[c]riminal penalties" and sets forth the relief that a court may grant in a criminal RICO proceeding, not a civil proceeding like the present case. 18 U.S.C. § 1963(d)(1). Section 1963 also allows restraining orders only "[u]pon application of the United States," not states or municipalities like the plaintiffs in this case. *Id.* Further, the criminal RICO statute allows a court to issue a restraining order or injunction "to preserve the availability of property . . . for forfeiture." *Id.* § 1963(d). Plaintiffs do not move to preserve property or accounts of third parties that plaintiffs might have a right to at the close of their case against defendants. In short, this is not a situation where plaintiffs seek "'to preserve the *status quo*.'" *Regan,* 858 F.2d at 119 (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 202, 204).

Instead, plaintiffs ask the court to order third parties to submit to an investigation into their financial records and, even beyond that, require the third parties to return any funds received from the Casino determined to have been improperly used.[20] In this way, plaintiffs' request is more like a typical injunction designed to affect

---

[20]    Plaintiffs do not explain how it will be determined whether the Foundations or Second Century properly used the Casino funds, or what standard will be employed to do so. Perhaps plaintiffs believe that the court should hold a second trial at the close of the forensic accounting, or plaintiffs might believe that they themselves should serve as the fact-finders on the issue of the liability of the Foundations and Second Century. The court is not aware of a procedural device which would allow either scenario.

the conduct of an entity based on a determination of that entity's legal rights – the very circumstances *Regan* distinguished in justifying its holding. Therefore, *Regan's* logic advises *against* allowing an order as to third parties in this instance.

Plaintiffs have also failed to acknowledge that the Seventh Circuit unabashedly criticized *Regan* for allowing injunctive relief against a non-party in *United States v. Kirschenbaum,* 156 F.3d 784, 795 (7th Cir. 1998). In *Kirschenbaum,* the government argued that because the Second Circuit allowed an order against a third party under the RICO criminal forfeiture statute, the Seventh Circuit should similarly allow an order against a third party pursuant to title 18 U.S.C. § 853(e)(1), another criminal forfeiture statute. *Id.* at 787. The Seventh Circuit declined to do so, holding that "the *Regan* court did not address the fundamental constitutional problems with interpreting the [RICO criminal forfeiture] statute as it did. However convenient it may be for the government to violate the due process rights of some citizens in an effort to seize property that it contends is forfeitable, we see no way that it could do so." *Id.* at 794-95.

The *Kirschenbaum* court explained the limited circumstances under which a non-party may be subjected to the terms of an injunction, as set forth in FEDERAL RULE OF CIVIL PROCEDURE 65.[21] *Id.* at 794. RULE 65 states that injunctive relief is "binding only on the parties to the action" and two other classes of persons: (1) the parties' "officers,

_____

[21]     Whether plaintiffs request an "injunction" in the RULE 65 sense is not one the court necessarily needs to decide. By arguing for the application of *Regan* and other cases involving injunctions and referring to the relief they seek as injunctive in nature (*see, e.g.,* DE # 578 at 18), plaintiffs have triggered a discussion of the due process concerns raised by that particular type of relief.

agents, servants, employees, and attorneys," and (2) "those parties in active concert or participation with [the parties] who receive actual notice of the order." FED. R. CIV. P. 65. The second category is intended for situations where the non-party aided or abetted a party in violating the injunction, or where a party transfers its interest in property subject to the litigation to a non-party in order to avoid the injunction. *Herrlein,* 526 F.2d at 254. Thus, the purpose of the additional classes of persons enumerated in RULE 65 is to prevent a named party from using a third party to avoid a court order binding the named party in the first place.[22] *Id.*

In this case, plaintiffs do not contend that Pastrick or any other defendant has transferred (or even plans to transfer) money to the Foundations or Second Century in the hopes of avoiding paying that money to plaintiffs. Indeed, it is not defendants' assets, hidden away in the hands of third parties, that plaintiffs seek. Rather, plaintiffs seek the assets of these third parties themselves. Ordering a forensic accounting of non-parties' financial records and later ordering the disgorgement of any ill-spent monies would be improper because "[t]he injunction [would be] more than an order preserving the court's ability to render judgment in a case over which it had jurisdiction." *Id.* at 255.

---

[22]    RULE 65 is a codification of the well-established principle of due process articulated by Judge Learned Hand in 1930 that "'[n]o court can make a decree which will bind any one but a party. . . . [T]he only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has the power to forbid, an act of a party. This means that the respondent must either abet the defendant, or must be legally identified with him.'" *Herrlein,* 526 F.2d at 253 (quoting *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir. 1930)).

Plaintiffs emphasize the broad remedial purpose of RICO and its statutory liberal construction clause in an attempt to justify the imposition of a court-ordered investigation of and potential disgorgement of funds from third parties. (Pls.' Resp. to Mot. to Intervene 17 n.2.) But even the broadest remedial purpose cannot do away with the requirements of due process. As the Seventh Circuit stated in *Kirschenbaum*, "[e]ven if Congress intended to abrogate due process by empowering a district court to enjoin parties over whom it had no jurisdiction, it could not." 156 F.3d at 795.

*Other Procedural Issues*

Aside from implicating problems of due process and jurisdiction, plaintiffs' request for an investigation and possible disgorgement of funds from non-parties raises a virtual cornucopia of additional procedural questions that have no easy or apparent answers, not the least of which is the timing of the request. Despite the fact that the liability portion of this case concluded when the remaining named defendants defaulted by not appearing at trial, plaintiffs ask this court to order a fact-finding mission into the financial records of third parties in order to determine their "innocence." (Pls.' Resp. to Mot. to Intervene 18; Tr. 176.) Plaintiffs have pointed to, and the court can locate, no authority permitting an inquiry into the potential liability of a non-party at this stage.

Plaintiffs' request would also require the court to act as an investigatory body, in search of evidence of wrongdoing on the part of the Foundations and Second Century. However, the federal judiciary's system of civil litigation provides rules, for example the rules governing the discovery of evidence, *see, e.g.*, FED. R. CIV. P. 26- 37, to uncover

this type of information, which the parties may properly present at various points throughout the course of the lawsuit including during summary judgment proceedings or at trial. Plaintiffs may not now circumvent the FEDERAL RULES OF CIVIL PROCEDURE and the well-settled rules of discovery by attempting to uncover evidence implicating non-parties through the back door.

Plaintiffs' request is also problematic because it is evident that plaintiffs intend to eventually seek the disgorgement of any ill-spent funds from the Foundations and Second Century. (Tr. 178 ("[I]f the money [the Foundations and Second Century received from the Casino] went to Pastrick family, kids, then that money ought to come back to the City.").) However, there is disagreement amongst the Courts of Appeals as to whether disgorgement and other "backward-looking" relief is available as a civil RICO remedy, and the Seventh Circuit has not ruled on the issue.[23] Plaintiffs avoid a substantive discussion of this problem, suggesting that the court simply not bother with the circuit split until the disgorgement of some person's funds is imminent. (Pls.' Prop.

---

[23] The split stems from language in section 1964 that grants courts jurisdiction to issue orders "to prevent and restrain" RICO violations. 18 U.S.C. § 1964(a). Some courts have held that "[t]his language indicates that the jurisdiction is limited to forward-looking remedies that are aimed at future violations," where "[d]isgorgement, on the other hand, is a quintessentially backward-looking remedy focused on remedying the effects of past conduct." *United States v. Philip Morris USA, Inc.,* 396 F.3d 1190, 1198 (D.C. Cir. 2005) (holding that disgorgement relief is not available under any circumstances); *see also Richard v. Hoechst Celanese Chem. Group, Inc.,* 355 F.3d 345, 354 (5th Cir. 2003) (disgorgement not available because request was not forward-looking); *but see United States v. Carson,* 52 F.3d 1173, 1182 (2d Cir. 1995) (disgorgement might be available if purpose was forward-looking). This court need not address the circuit split on the issue of backwards-looking relief, as this matter can be decided on due process grounds, but the issue is a prime example of how plaintiffs raise more questions with their request than they provide answers.

Find. of Fact & Concl. of Law 19 n.7.) However, there seems to be little point in ordering an investigation into the potential improper use of third parties' funds if at the end of the process plaintiffs are not entitled to disgorge those funds.

Finally, plaintiffs have not persuaded this court that they have any factual basis warranting a court-ordered investigation into the financial records of the Foundations or Second Century. Plaintiffs have not presented the court with any convincing theory under which funds belonging to the Foundations or Second Century should "come back to the City" (Tr. 176), given that the funds at issue went directly from the Casino to the Foundations or Second Century and were never in the hands of the City in the first place. Perhaps the Foundations and Second Century were the beneficiaries of a contract between the City and the Casino; if so, presumably plaintiffs are free to pursue a case against the Foundations or Second Century on contract or other grounds. Indeed, it appears there are numerous, ongoing proceedings involving plaintiffs and these third parties in state court. (*See* Foundations' Mot. to Intervene ¶¶ 1-9; Pls.' Resp. to Mot. to Intervene 7-11; Foundations' Mot. to Suppl. Mot. to Intervene, DE # 577 at 2.)

The lack of factual basis behind plaintiffs' request becomes even more apparent when one considers that both the federal RICO and Indiana little RICO statutes authorize relief only after a finding of a violation of their substantive anti-racketeering provisions. 18 U.S.C. § 1964 (a district court may "prevent or restrain violations" of law and plaintiffs may recover damages incurred "by reason of a violation" of law); IND. CODE § 34-24-2-6 (damages may be assessed against person "who has violated" the law and injunction may be ordered where "court finds, through a preponderance of the

evidence, that the aggrieved person is suffering from corrupt business influence").

Plaintiffs admitted at the damages hearing that "what we've done here in proving damages is from the city's records. You haven't heard one item of evidence from Second Century, East Chicago, or Twin City." (Tr. 178.) Plaintiffs are exactly right; no attempt has been made to prove that the Foundations or Second Century committed any RICO violations. Plaintiffs did not even so much as allege any wrongdoing against the Foundations or Second Century in their complaint.[24]

The bottom line is this: plaintiffs were free to name the Foundations or Second Century in this lawsuit in accordance with the FEDERAL RULES OF CIVIL PROCEDURE if plaintiffs wanted to obtain a judgment against them. However, plaintiffs themselves admitted that "what we didn't have was sufficient good faith under Rule 9 [sic]" to do so. (Tr. 176.) Plaintiffs further stated that the Foundations and Second Century are "not defendants in this case, and we couldn't bring them in where all we had was probable cause to believe the mayor was involved." (Tr. 178.) The fact that plaintiffs did not, or in good faith could not, name or join the Foundations and Second Century in this lawsuit does not require the court to bend the law to accommodate their request.

---

[24]    In the most notable reference to the Foundations in the complaint, plaintiffs use the allocation of Casino funds to the Foundations as an example of an appropriation that was *properly* pre-approved by the East Chicago Common Council, as opposed to the allocation of casino funds to the City, which were improperly diverted to and controlled by Pastrick's Executive Finance Committee and Gaming Trust. (Compl. ¶¶ 59-60.) The complaint contains no reference to Second Century.

**Rescission**

Plaintiffs briefly request that the court rescind the agreement between the City and the Casino, which, as explained previously, diverted Casino revenue to the Foundations and Second Century. (Pls.' Prop. Find. of Fact & Concl. of Law 25.) Because the Casino is not a party to this lawsuit, the court's discussion above regarding problems of due process and jurisdiction inherent in remedies involving third parties applies to this request as well. The court's analysis in this regard would be the same even if plaintiffs sought rescission as a remedy under the laws of the State of Indiana. *Tri-Professional Realty, Inc. v. Hillenburg,* 669 N.E.2d 1064, 1070 (Ind. Ct. App. 1996) (rescission unavailable where party to contract was not joined in action).

**The Foundations' Motion to Intervene**

Because the court declines to order plaintiffs' requested relief against the Foundations, which is precisely the outcome sought by the Foundations in their motion to intervene, the Foundations' motion to intervene (DE # 573) and motion to supplement its motion to intervene (DE # 577) are denied as moot. *In re Ingersoll, Inc.,* 562 F.3d 856, 865 (7th Cir. 2009) (denying motion to intervene as moot because as a result of the court's substantive ruling in the case, movant "effectively gets what he wants").

## V.    CONCLUSION

The motion of the Foundations of East Chicago to intervene in this matter (DE # 573) and to supplement its motion to intervene (DE # 577) are **DENIED** as moot.

The Clerk is to **ENTER FINAL JUDGMENT** in this case, stating:

"(a)    Judgment is entered in favor of plaintiff the City of East Chicago and against defendants Robert A. Pastrick, James Harold Fife, III, and Frank Kollintzas, jointly and severally, in the amount of $108,007,584.33.

(b)    Judgment is entered in favor of plaintiffs the City of East Chicago and the State of Indiana and against defendant A&A Enterprises, jointly and severally with defendants Robert A. Pastrick, James Harold Fife, III, and Frank Kollintzas, in the amount of $3,072,830.31 of the $108,007,584.33 referenced in paragraph (a).

(c)    Judgment is entered in favor of plaintiffs the City of East Chicago and the State of Indiana and against defendant Ace Enterprises, jointly and severally with defendants Robert A. Pastrick, James Harold Fife, III, and Frank Kollintzas, in the amount of $4,245,681.99 of the $108,007,584.33 referenced in paragraph (a).

(d)    Judgment is entered in favor of plaintiffs the City of East Chicago and the State of Indiana and against defendant B&S Construction Co., jointly and severally with defendants Robert A. Pastrick, James

Harold Fife, III, and Frank Kollintzas, in the amount of $621,635.64

of the $108,007,584.33 referenced in paragraph (a).

(e) Judgment is entered in favor of plaintiffs the City of East Chicago

and the State of Indiana and against defendant D/S Commercial

Equipment & Construction, jointly and severally with defendants

Robert A. Pastrick, James Harold Fife, III, and Frank Kollintzas, in

the amount of $621,635.64 of the $108,007,584.33 referenced in

paragraph (a).

(f) Judgment is entered in favor of plaintiffs the City of East Chicago

and the State of Indiana and against defendant H & Y Maintenance

Co., Inc., jointly and severally with defendants Robert A. Pastrick,

James Harold Fife, III, and Frank Kollintzas, in the amount of

$7,003,527.00 of the $108,007,584.33 referenced in paragraph (a).

(g) Judgment is entered in favor of plaintiffs the City of East Chicago

and the State of Indiana and against defendant Windstorm

Enterprises Inc., jointly and severally with defendants Robert A.

Pastrick, James Harold Fife, III, and Frank Kollintzas, in the amount

of $2,786,608.68 of the $108,007,584.33 referenced in paragraph (a).

(h) The claims of plaintiffs the City of East Chicago and the State of

Indiana against defendants Kimberly K. Anderson; Joe De La Cruz;

Edward Maldonado; Frank Miskowski; Pedro Porras; Timothy W.

Raykovich; Adrian Santos; Jose Valdez, Jr.; George E. Weems; A-1

Dave's Tree Service Inc. d/b/a Dave's Tree Service; Calumet Concrete and Masonry Inc.; Garcia Le & Associates LLC d/b/a Great Lakes Engineering LLC; JGM Enterprises Inc.; Rieth-Riley Construction Co. Inc.; Roger & Sons Construction Co Inc.; St. Paul Fire and Marine Insurance; and TRI Inc. are dismissed with prejudice pursuant to FEDERAL RULE OF CIVIL PROCEDURE 41(a)(1).

(i)     The claims of plaintiffs the City of East Chicago and the State of Indiana against defendant Residential Construction Service Inc. a/k/a Residential Roofing & Concrete Inc. are dismissed without prejudice pursuant to FEDERAL RULE OF CIVIL PROCEDURE 41(a)(1).

(j)     The claims of plaintiffs the City of East Chicago and the State of Indiana against Defendants A through Z, and the claims of Third Party Plaintiff Roger & Sons Construction Co. Inc. against Third Party Defendants 1 through 50, are dismissed without prejudice pursuant to FEDERAL RULE OF CIVIL PROCEDURE 4(m).

(k)     Reasonable costs and attorneys' fees, the amount of which will be determined in subsequent proceedings before the court, are imposed in favor of plaintiffs the City of East Chicago and the State of Indiana, and against Robert A. Pastrick; James Harold Fife, III; Frank Kollintzas; A&A Enterprises; Ace Enterprises; B&S Construction Co.; D/S Commercial Equipment & Construction; H & Y Maintenance Co., Inc.; and Windstorm Enterprises Inc.

Plaintiffs are to file a petition for attorneys fees and taxation of costs in accordance with the appropriate federal and local rules of civil procedure."

**SO ORDERED.**

Date: March 11, 2010

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT